## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JIM HENRY BALL, JR., | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **Case No.: 2:16-cv-01425-RDP** |
| | } | |
| R. MCCOULLOUGH, et al., | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is before the court on the Motion for Summary Judgment filed by the following Defendants: the City of Birmingham, Verlyne Moten[1], Freida Taylor, Lawerence Singleton, Deidre Daniels, Emantic Bradford, Timothy Brown, Coyrrie Campbell, and Kathie Davis (collectively, "the Movants").[2] (Doc. # 182). Consistent with the Eleventh Circuit's decision in *McBride v. Sharpe*, 981 F.2d 1234, 1236 (11th Cir. 1993), the court gave the pro se Plaintiff, Jim Henry Ball, Jr., "express, ten-day notice of the summary judgment rules, of his right to file affidavits or other materials in opposition to the motion, and of the consequences of default." (Doc. # 184).[3] The parties have fully briefed the motion. (Docs. # 183, 190, 191). For the reasons explained below, the Movants' Motion for Summary Judgment is due to be granted in part and denied in part.

---

[1] The Movants spell this Defendant's last name "M-O-T-O-N". (Doc. # 182). The court will continue to use the spelling M-O-T-E-N," which is consistent with the spelling used in the Second Amended Complaint (Doc. # 74 at 4, ¶ 12), the docket sheet, other court orders (*see e.g.*, Doc. # 76 at 1 n. 1), and this Defendant's affidavit (Doc. # 183-8 at 6-8).

[2] Not all of the Defendants are parties to this motion. *See infra* Section I.

[3] On March 14, 2019, Attorney Theodore Richard Pearson filed a notice of appearance on behalf of Mr. Ball. (Doc. # 193). The court held a telephone conference on May 13, 2019. (Doc. # 195; minute entry dated May 13, 2019). During the conference, Mr. Ball informed the court that Mr. Pearson represents Mr. Ball only for the limited purpose of trying this case, if necessary. Regardless, Mr. Ball did not have counsel when the Movants filed the instant motion.

# I. Procedural History

## A. The Second Amended Complaint Is the Operative Complaint

Mr. Ball filed this civil action in the Circuit Court of Montgomery County, Alabama on May 20, 2016. (Doc. # 1-1 at 1). On July 7, 2017, Dr. Paul O'Leary, who is no longer a party, removed the case to the United States District Court for the Middle District of Alabama. (*Id.*).[4] On August 29, 2016, the Middle District of Alabama transferred the case to this district. (Doc. # 1 at 10; Doc. # 13). Mr. Ball filed an Amended Complaint on January 9, 2017. (Doc. # 43).

On May 3, 2017, this court appointed attorney David Gespass "for the limited purpose of drafting a second amended complaint which raises cognizable claims and complies with the Federal Rules of Civil Procedure." (Doc. # 73 at 1). On June 19, 2017, Mr. Gespass filed a Second Amended Complaint on Mr. Ball's behalf. (Doc. # 74). The claims in the Second Amended Complaint relate to (1) Mr. Ball's confinement in the Birmingham City Jail (the "Jail"), and (2) Mr. Ball's treatment while at Grandview Medical Center[5] in January 2015. (Doc. # 74). The Second Amended Complaint named the following parties as Defendants:[6]

- the City of Birmingham (Doc. # 74 at 3, ¶ 9);

- "[Kathie Davis,][7] [who] was, at all relevant times, the chief correctional officer at the jail" (Doc. # 74 at 3, ¶ 10);[8]

---

[4] Dr. O'Leary filed the Notice of Removal alone, and, in accordance with 42 U.S.C. § 1446(b)(2)(A), with the consent of "[all] Defendants who purportedly have been served with process according to the Clerk of the Circuit Court of Montgomery County, Alabama." (Docs. # 1-1 at 2; 1-12; 1-13; 1-14; 1-15).

[5] The parties sometimes refer to this hospital as "Trinity Medical Center," "Trinity Hospital," and/or "Trinity."

[6] Where appropriate, the court has noted in brackets the correct name of each Defendant.

[7] The Second Amended Complaint simply identifies this Defendant as "Davis." (Doc. # 74 at 3, ¶ 10).

[8] The Defendants refer to Davis as the "Commander of the City Jail." (Doc. # 183 at 21).

- "[Lawrence Singleton][9], [Freida Taylor][10], [Coyrrie Campbell][11], Nunn, Sheffield, Debra[,] and Rogers[,] [who] were, at all relevant times, correctional officers at the jail (Doc. # 74 at 4, ¶ 11);[12]

- "[Timothy Brown][13], [Verlyne Moten,][14] and Drake[,] [who] were[,] at all relevant times, employed as sergeants at the jail" (Doc. # 74 at 4, ¶ 12);[15]

- "[Emantic Bradford,][16] [who] was, at all relevant times, the chief steward at the Jail" (Doc. # 74 at 4, ¶ 13);[17]

- "[Deidre Daniels][18] [who] was, at all relevant times, a social worker in the jail" (Doc. # 74 at 4, ¶ 14); and

- "Karen E. Callahan[,] [who] was, at all relevant times, a doctor employed at Grandview Medical Center (formerly Trinity Medical Center) who treated [the] [P]laintiff while he was there" (Doc. # 74 at 4, ¶ 15).

On June 22, 2017, the court dismissed the Defendants (including the Defendant identified only as "W. Fowler") who Mr. Ball named in the Complaint and/or First Amended Complaint,

---

[9] The Second Amended Complaint merely identifies this Defendant as "Singleton." (Doc. # 74 at 4, ¶ 11).

[10] The Second Amended Complaint merely identifies this Defendant as "Taylor." (Doc. # 74 at 4, ¶ 11).

[11] The Second Amended Complaint merely identifies this Defendant as "Campbell." (Doc. # 74 at 4, ¶ 11).

[12] The Defendants refer to Taylor as a nurse. (Doc. #183 at 24).

[13] The Second Amended Complaint merely identifies this Defendant as "T. Brown." (Doc. # 74 at 4, ¶ 12).

[14] The Second Amended Complaint merely identifies this Defendant as "Moten." (Doc. # 74 at 4, ¶ 12).

[15] The Defendants refer to Brown as "a Correctional Officer at the Birmingham City Jail." (Doc. # 183 at 26).

[16] The Second Amended Complaint merely identifies this Defendant as "Bradford." (Doc. # 74 at 4, ¶ 13).

[17] The Defendants refer to Bradford as "a cook." (Doc. # 183 at 24).

[18] The Second Amended Complaint merely identifies this Defendant as "Daniels." (Doc. # 74 at 4, ¶ 14).

but did not name in the Second Amended Complaint. (Doc. # 76). In its Order, the court specifically noted that "[t]his action will proceed against Defendants City of Birmingham, Davis, Singleton, Taylor, Campbell, Nunn, Sheffield, Debra, Rogers, T. Brown, Moten, Drake, Bradford, Daniels, and Callahan." (Doc. # 76, at 1, n. 1). The parties and the court have come to refer to the individually named Defendants as the "City Defendants."

On August 1, 2017, the court gave Mr. Ball leave to amend his complaint and provided the following instructions:

> His amendment should detail the specific facts alleged regarding Defendant Fowler, as well as the legal claims Plaintiff intends to pursue against Defendant Fowler. Plaintiff **SHALL** include any other changes he desires to make to his complaint in this amendment.

(Doc. # 88 at 1). On August 11, 2017, Mr. Ball filed a Third Amended Complaint which added claims only against Defendant Fowler. (Doc. # 97). On October 17, 2017, the court severed Mr. Ball's claims against Defendant Callahan into a separate case, dismissed Mr. Ball's federal claims against Defendant Callahan, and remanded Mr. Ball's case against Defendant Callahan to the Circuit Court of Montgomery County, Alabama. (Doc. # 118).

On November 1, 2017, Defendant Fowler filed a Motion for More Definite Statement pursuant to Rule 12(e) of the Federal Rules of Civil Procedure. (Doc. # 123). On November 6, 2017, the court granted that motion and ordered Mr. Ball to re-plead his claims against Defendant Fowler. (Doc. # 124). On November 13, 2017, Mr. Ball filed a Fourth Amended Complaint asserting claims only against Defendant Fowler. (Doc. # 127). To be clear, the Third and Fourth Amended Complaints were actually only "amendments to" the Second Amended Complaint, as each merely added Fowler as a party and asserted claims against Fowler alone. The court dismissed Defendant Fowler on January 22, 2018, and the Second Amended Complaint once again became the "operative complaint in this case." (Doc. # 145 at 9).

## B.  Mr. Ball Has Not Perfected Service on Several of the City Defendants

The record reflects that Mr. Ball executed service on several of the City Defendants on March 21, 2017. (Doc. # 65). On April 4, 2017, those Defendants contested service arguing that service "was improperly accomplished, by attempting to serve the City of Birmingham's Legal Department and/or Birmingham City Clerk's office, by hand delivery on or about March 15, 2017." (Doc. # 66 at 5; *see also* Doc. # 67). On June 22, 2017, after the filing of the Second Amended Complaint, the court noted:

> Before Plaintiff filed his second amended complaint, certain Defendants maintained that they were improperly served. The court will conduct a telephone conference on July 5, 2017 at 11:00 a.m. to discuss this issue with Plaintiff and the remaining Defendants.

(Doc. # 76 at 2). The court held the telephone conference as scheduled, but Mr. Ball did not attend. (Minute Entry July 5, 2017). Following that conference, the court entered the following Order:

> Defendants Nunn, Sheffield, Debra, T. Brown, and Drake have not been served for purposes of this action. Plaintiff is **DIRECTED** to request service and provide sufficient identifying information for these Defendants on or before July 21, 2017. Failure to do so may result in dismissal of this action against those Defendants.

(Doc. # 79 at 1).

The court held a hearing in this matter on August 11, 2017, after which, at the direction of the court, Mr. Ball met with counsel for the Defendants upon whom he had perfected service at that time. (Doc. # 88 at 1). Thereafter, the City provided the Clerk of Court the name and address of "Timothy Brown" for "T. Brown," and "George Drake" for "Drake." (Doc. # 89 at 1). The City represented that it "does not have the personal addresses or knowledge of the location of 'Nunn', 'Sheffield' and 'Debra' as they are not employed by the City and have never been employed with the City." (Doc. # 89 at 2).

Thereafter, service was executed upon Timothy Brown, but was returned unexecuted as to George Drake. (Docs. # 94, 133). On December 4, 2017, after Mr. Ball referred to George Drake as "non-existing," and "not [a] Defendant[] to this instant [case]," the court dismissed George Drake and ordered Mr. Ball to provide the court with the full name [and address] of Drake." (Doc. # 137 at 1) (citing Doc. # 131 at 2). The court's December 4, 2017, Order "terminated" Drake in the court's CM/ECF system (Doc. # 137), and Drake remains terminated.[19]

Thereafter, despite the fact that the court did not name Rogers as an unserved Defendant, Mr. Ball served discovery requests upon the Defendants seeking the full name and last known address of Rogers, as well as Drake, Nunn, Debra, and Sheffield. (*See* Doc. # 168). The City eventually identified a person known as "Judy Drake" who might be the "Drake" Mr. Ball wished to sue. On September 4, 2017, the court Ordered the City of Birmingham to provide the full name and last known address, if they had it, of Judy Drake. (Doc. # 171 at 2). The court did not issue a similar order regarding Nunn, Debra, Rogers, and Sheffield, because the City of Birmingham "[had] previously advised the court and Plaintiff that it does not have the personal addresses or knowledge of the location of [these individuals] because they are not, and never have been, employed by the City." (Doc. # 171 at 2) (citing Doc. # 89 at 2)). On September 6, 2018, the City of Birmingham confirmed that they did not have the address of Judy Drake. (Doc. # 173).

Federal Rule of Civil Procedure 4(m) provides that "[i]f a defendant is not served within 90 days after the complaint is filed, the court--on motion or on its own after notice to the plaintiff--must dismiss the action without prejudice against that defendant or order that service

---

[19] That same order also dismissed "Kevin Davis," but that individual has now been properly identified as Kathie Davis, and Kathie Davis remains a party. (Doc. #137 at 1).

be made within a specified time." More than 90 days has passed since the operative complaint naming Defendants Nunn, Sheffield, Debra, and Rogers was filed. (Doc. # 74 at 4, ¶ 11) (filed June 19, 2017). As noted above, the court gave Mr. Ball notice on July 5, 2017 that failure to serve these defendants could result in dismissal of this action against the unserved defendants. (Doc. # 79). Mr. Ball has neither requested service for, nor perfected service upon, Defendants Nunn, Sheffield, Debra and Rogers since this court's Order of July 5, 2017. Accordingly, all claims in this action against unserved Defendants Nunn, Sheffield, Debra, and Rogers are due to be dismissed without prejudice under Rule 4(m). Thus, there are nine Defendants who remain in this case: the City of Birmingham, Verlyne Moten, Freida Taylor, Lawrence Singleton, Deidre Daniels, Emantic Bradford, Timothy Brown, Coyrrie Campbell, and Kathie Davis. As noted above, each of these Defendants has moved for summary judgment.

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id*. at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As Anderson teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.' " *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also, LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III. Factual Background

The court has gleaned the facts set out in this opinion from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).[20]

---

[20] In their reply brief, the Movants correctly state that "Ball . . . failed to respond to any of the Defendants' Statement of Case [sic]." (Doc. # 190 at 2). Presumably, the Movants bring this to the court's attention because of the following language contained in this court's Initial Order entered on October 4, 2016: "*All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*" (Doc. # 24) (italics in original). Of course, that Order <u>also</u> states that the parties' submissions must consist of: "(1) a brief containing, in separately identified sections, (i) a statement of allegedly undisputed relevant material facts and (ii) a discussion of relevant legal authorities; and (2) copies of any evidentiary materials upon which the party relies." (Doc. # 24 at 12). The Order does not mention a "Statement of the Case." Assuming that the Movants meant to substitute a "Statement of the Case" for the court's requirement that the brief contain "a statement of allegedly undisputed relevant material facts," it also fails in that regard. Appendix II states:

> The moving party shall list *in separately numbered paragraphs* each material fact the movant contends is true and not in genuine dispute, and <u>upon which the moving party relies to demonstrate that it is entitled to summary judgment.</u> Each such statement must be followed by a specific reference to those portions of the evidentiary record that the movant claims support it.

(Doc. # 24 at 14) (italics in original and underlining added). Appendix II is clear that the statement of facts must set out <u>all</u> facts upon which the moving party relies to demonstrate that it is entitled to summary judgment. The

## A. Mr. Ball's Affidavit

Before delving into the Rule 56 record, the court addresses the "Affidavit" Mr. Ball submitted in opposition to the Movants' motion for summary judgment. (Doc. # 191 at 5, 7-23). While they do not move to strike that document, the Movants argue that "[Mr.] Ball's 'affidavit' is not signed, witnessed and notarized under oath before a certified notary public. Rather, Ball executes his own 'affidavit'. Thus, it is not a true affidavit required under FRCP Rule 56(c)(4)." (Doc. # 190 at 2).

"An affidavit is a sworn statement in writing made under oath or on affirmation before a notary public or other authorized officer." *Holder v. State Farm Fire & Cas. Co.*, 2008 WL 3887632, at *4 (S.D. Ga. Aug. 21, 2008). Since it is not sworn, Mr. Ball's submission is not an affidavit. However, 28 U.S.C. § 1746 provides, in pertinent part:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same . . . , such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
>
> * * *
>
> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).
>
> (Signature)".

---

Movants' facts provide little to no information about this case, or Mr. Ball's contentions. Accordingly, strict adherence to the requirements of this court's Initial Order would severely undercut the Movants. The court is certain that the Movants would prefer the more flexible approach the court has employed, drawing the relevant facts from the court's review of the evidentiary record. This approach is also appropriate due to Mr. Ball's status as a pro se litigant.

28 U.S.C. § 1746. Furthermore, this court previously advised Mr. Ball that "[a]ffidavits must either be notarized or be subscribed as true under penalty of perjury. (Doc. # 184 at 3) (emphasis added). Mr. Ball's submission is dated and signed "under . . . penalty of perjury." (Doc. # 191 at 23). Mr. Ball's submission substantially follows the form required by 28 U.S.C. § 1746 and complies with this court's Order. The court concludes that Mr. Ball's submission is therefore a declaration submitted in opposition to the instant motion.

Whether the court may consider Mr. Ball's submission is another matter. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In their reply brief, the Movants do not address the substance of Mr. Ball's submission (Doc. # 191), calling it "mere incoherent and editorial rambling which the Defendants, at times, cannot defend or understand." (Doc. # 190 at 2). The Movants also contend that Mr. Ball's submission "presents nothing substantive," that Mr. Ball's "'facts' and 'arguments' are based on his own opinions, ideas, and conspiracy[-]fueled theories," and that Mr. Ball "at times, merely repeats the allegations in the [Second] Amended Complaint." (Doc. # 190 at 2). The Movants cite no examples to support these claims. The court will consider Mr. Ball's submission, but it will also assess whether the Movants are correct as to some portions of Mr. Ball's submission and determine the extent to which the submission complies with Rule 56(c)(4) of the Federal Rules of Civil Procedure.

## B.  The Traffic Accident and Mr. Ball's Arrest

On May 3, 2014, Mr. Ball was involved in a car accident in Birmingham, Alabama. (Doc.

# 183-1 at 9(35-36); Doc. # 183-5 at 2).[21] When the Birmingham Police arrived on the scene, they discovered that Mr. Ball had an outstanding arrest warrant and arrested him. (Doc. # 183-1 at 10(37-38); Doc. # 183-5 at 2). The arresting officers transported Mr. Ball to the University of Alabama at Birmingham Medical Center (UAB) for psychiatric evaluation and treatment. (Doc. # 183-1 at 10(39-40), 12(46); Doc. # 183-5 at 2).[22] Mr. Ball stayed at UAB for a few hours. (Doc. # 183-1 at 10(40), 12(46); Doc. # 183-5 at 2). Thereafter, Birmingham police officers transported Mr. Ball to the Birmingham City Jail. (Doc. # 183-1 at 11(41); Doc. # 183-5 at 2). Mr. Ball was held at the Jail from May 3, 2014, until March 17, 2015. (Doc. # 183-1 at 12(45)).

Kathie Davis was the City Jail Chief or Chief Correctional Officer at the Jail at the time Mr. Ball was there. (Doc. # 163-1 at 20; Doc. # 183-8 at 1). Her responsibilities in that role were to "manage, coordinate and supervise all the employees at the Birmingham City Jail," and to "observe the conduct and behavior of inmates to prevent disturbances and escapes." (Doc. # 183-8 at 1). Officer Davis admits that while Mr. Ball was at the Jail, it was her responsibility to train and supervise her subordinates to prevent constitutional violations. (Doc. # 163-1 at 31). However, in her affidavit she denies any familiarity with Mr. Ball. (Doc. # 183-8 at 3).

## C. The Conditions of Mr. Ball's Confinement

Mr. Ball testified to being in a cell "without any exercise, without any showers[,] and without the proper recommended diet." (Doc. #183-1 at 14(56)). In his declaration, Mr. Ball states:

> On December 9, 2014 . . . the Plaintiff sat in his stripped, cold, suicidal observation cell hemorrhaging from the inside of his body[.] [S]aid cell only had a

---

[21] Document # 183-1 is Mr. Ball's deposition which appears in the record as a "minuscript" or "travel transcript," with four deposition pages condensed onto each page of the record. The court's citation indicates that the source is on page 9 of document 183-1, at deposition pages 35 through 36.

[22] Mr. Ball went to UAB for treatment four times while incarcerated in the Jail. (Doc. #183-1 at 12(46, 47)). None of Mr. Ball's claims relate to those trips.

sink and commode[.] [T]he sink did not work properly; it only trickle[d] hot water[] [and] not enough to drink[.] I had to request water from a cooler in the cell block day area.

I wasn't issued soap, toilet paper, [a] tooth brush, [or] tooth paste[.] Also, [my] cell windows were broken out and [there was] inadequate heat in the cell[.] [The] cell lights were broken, I wasn't allowed to shower, [and] the day room showers did not work either[.] I was denied any opportunity to exercise[.] I smelled horrible and felt worse. . . .

I wasn't allowed eating utensils to eat with[.]

(Doc. # 191 at 16). Mr. Ball also states that he was "in complete isolation from others," with no contact with others except "food [and medications] being passed through a tray slot in the cell door." (Doc. # 191 at 17). Mr. Ball states that Jail personnel fixed his cell lights on or about January 3, 2015. (Doc. # 191 at 17).[23]

### D. Jail Personnel Leave Mr. Ball Naked in His Cell

Jail personnel placed Mr. Ball on suicide watch, isolated in segregation, where he stayed from December 19, 2014, to January 5, 2015. (Doc. # 183-1 at 12(45), 14(55-56); *see also* Doc. # 183-8 at 15). Mr. Ball testified that Defendants Brown and Moten left him naked in his cell without a reason. (Doc. # 183-1 at 19(73)). Defendant Timothy Brown was a corrections officer ("C.O.") at the Jail while Mr. Ball was there. (Doc. # 183-8 at 9). His responsibilities were "to maintain security and enforce order and discipline among inmates to ensure a safe jail environment." (Doc. # 183-8 at 9). Officer Brown is familiar with Mr. Ball. (Doc. # 183-8 at 9).

Mr. Ball states that Jail personnel gave him a gown typically given to people on suicide watch, but that on December 9, 2014, Officer Brown took it from Mr. Ball and gave it to

---

[23] Again, these facts are set out in the light most favorable to Mr. Ball. Officer Bradford states that he issued Mr. Ball eating utensils with meals. (Doc. # 163-1 at 16). Officer Davis states that "everyone used plastic utensils to eat in the jail." (Doc. # 163-1 at 24). Officer Davis also states that Jail personnel <u>would have</u> allowed Mr. Ball out of his cell for one hour per day to shower, and for one hour per shift to exercise. (Doc. #163-1 at 22). However, that is not evidence that <u>Mr. Ball</u> was <u>in fact</u> given time to shower and exercise. Furthermore, as noted later in this opinion (*see infra* Section IV.A.3.), Officer Davis is in no position to know the conditions Mr. Ball actually experienced since she states that she does not know Mr. Ball. (Doc. # 183-8 at 3).

someone else, leaving Mr. Ball naked. (Doc. # 183-1 at 14(56)-15(57), 19(75-76); Doc. # 191 at 17). In his answers to Mr. Ball's First Interrogatories, Officer Brown states that he does not recall whether he confiscated Mr. Ball's gown on December 9, 2014. (Doc. # 141-1 at 10).[24] Officer Davis agrees that while Mr. Ball was on suicide watch, Jail personnel should have given Mr. Ball a gown to wear. (Doc. # 163-1 at 24).

Defendant Verlyne Moten was a sergeant at the Jail while Mr. Ball was there. (Doc. # 183-8 at 6). Her responsibilities included supervising and coordinating the correctional officers and prisoners at the Jail. (Doc. # 183-8 at 6). Officer Moten also maintained security and enforced order and discipline to ensure a safe jail environment. (Doc. # 183-8 at 6). Officer Davis was Officer Moten's supervisor. (Doc. # 183-8 at 6). Officer Moten says she is not familiar with Mr. Ball. (Doc. # 183-8 at 7). In her answers to Mr. Ball's First Interrogatories, Officer Moten states that she "had no contact with Mr. Ball." (Doc. # 141-1 at 15).

Although Mr. Ball testified in his deposition that he had direct conversations with Officers Moten and Brown, the nature and substance of those conversations is not in the Rule 56 record. (Doc. # 183-1 at 19(74)).[25]

### E. The Altercation with Defendant Singleton

Defendant Lawrence Singleton was a C.O. at the Jail while Mr. Ball was there. (Doc. # 163-1 at 2; Doc. # 183-8 at 21). Officer Moten was Officer Singleton's supervisor. (Doc. # 163 at 3). As a C.O., Officer Singleton is responsible for maintaining security and enforcing order and discipline among inmates to ensure a safe jail environment. (Doc. # 183-8 at 21). Mr. Ball

---

[24] Officer Brown provided these answers on November 30, 2017. (Doc. # 141-1 at 11). Officer Brown's affidavit, executed on October 6, 2018, does not mention this incident at all. (*See* Doc. # 183-8 at 9).

[25] During Mr. Ball's deposition, Mr. Fullerton asked Mr. Ball about the substance of those conversations, but the discourse was sidetracked before Mr. Ball answered. Mr. Fullerton never returned to that question. (Doc. # 183-1 at 19(75)).

testified that on December 10, 2014, Officer Singleton entered Mr. Ball's cell and "assaulted [him] and used force that wasn't warranted." (Doc. # 183-1 at 21(81, 82)).

Mr. Ball admitted in his deposition that he did not know why Officer Singleton came to the cell on that date. (Doc. # 183-1 at 21(84) ("I don't know why he was there."), 22(85) ("I don't know what his purpose for entering my cell [was].")). Officer Singleton explains that he came to get Mr. Ball because either Mr. Ball asked to see the nurse, or the nurse asked to see Mr. Ball—Officer Singleton could not remember which. (Doc. # 163-1 at 3). Officer Singleton states in his affidavit:

> Mr. Ball needed to see the nurse but was naked. He had been given a suicide gown which is made o[f] paper or some other easily torn material but he had taken or torn [it off] and was completely naked. I opened the cell to give him a regular uniform.
>
> In order to see the nurse, Mr. Ball needed to get dressed as he was naked at the time. I gave Mr. Ball a regular uniform.

(Doc. # 183-8 at 21-22; *see also*, Doc. # 163-1 at 3).

Mr. Ball refused to dress himself in the uniform Officer Singleton gave him. (Doc. # 163-1 at 4; Doc. # 183-8 at 22; Doc. # 191 at 8). Mr. Ball says that he refused the uniform because Officer Singleton did not also give him shoes, and because it was inappropriate for him to have a regular uniform, as opposed to a gown, inside the suicide observation unit. (Doc. # 191 at 8).

Mr. Ball testified that Officer Singleton then "came with profanity and things that was improper [sic]." (Doc. # 183-1 at 22(85)). In his declaration, Mr. Ball clarifies that Officer Singleton entered his cell and attempted to force him, physically, to put on the uniform. (Doc. # 191 at 9). Officer Singleton pushed Mr. Ball against the cell wall and then placed his large steel cell key against Mr. Ball's throat and choked Mr. Ball. (Doc. # 191 at 8, 9). Mr. Ball also asserts that Officer Singleton punched him in the head twice. (Doc. # 191 at 9). Mr. Ball then "backed

[Officer Singleton] out of [the] cell and held [Officer Singleton] until supervision arrived." (Doc. # 191 at 9). Mr. Ball suffered "excruciating pain and abrasions" from this incident, and went to the UAB emergency room for treatment. (Doc. # 191 at 9).[26]

A December 10, 2014, entry in Mr. Ball's Jail medical record reflects that on that date Mr. Ball had an "altercation with [an] officer," and noted that Mr. Ball had a "red area on the [right] side of [his] chest." (Doc. # 191 at 28). Mr. Ball also complained of chest pain. (Doc. # 191 at 28). The note reflects that Mr. Ball was "sent to [the] hospital for evaluation," and later "[returned] from the hospital [with a diagnosis] of superficial abrasion" and a normal EKG. (Doc. # 191 at 28). Officer Singleton did not initiate any disciplinary proceedings against Mr. Ball as a result of Mr. Ball refusing to comply with his orders (Doc. # 163-1 at 4), and there are no records of any other disciplinary proceedings which arose out of this incident.

Mr. Ball contends that there is an "administrative policy, regulation, or [standard operating procedure (SOP)"] for cell extraction which Singleton did not follow, and that Officer Moten failed to train Officer Singleton to follow. (Doc. # 191 at 9).[27] The record contains no evidence of this policy and/or procedure, and Officer Singleton is "not familiar with" such a policy. (Doc. # 163-1 at3, 4). Mr. Ball explained: "I feel that any contact whatsoever from any correctional officer was improper because I was under psychiatric, you know, treatment." (Doc.

---

[26] These facts are set out in the light most favorable to Mr. Ball, the non-movant. Officer Singleton admits that there was a physical confrontation but states that Mr. Ball started it "by pushing and later grabbing [him]." (Doc. 163-1 at 3; *see also* Doc. # 163-1 at 4 ("Ball pushed then grabbed and shook me[.]")). According to Officer Singleton:

> Mr. Ball suddenly became aggressive and belligerent. He started to curse and would not comply with the lawful direct orders I was giving him to stay put until assistance arrived. Mr. Ball suddenly pushed me, then grabbed me and shook me after refusing to get dressed to see the nurse. I pushed him off me and assistance was called. Assistance arrived and handled the matter.

(Doc. # 183-8 at 22; *see also*, Doc. # 163-1 at 4).

[27] Mr. Ball sometimes refers to this as "the Administrative cell extraction policy, regulation, or S.O.P." (Doc. # 159 at 13; Doc. # 163-1 at 3).

# 183-1 at 22(85)). He continued:

> [W]hat I'm saying is Singleton -- it had to be for no reason -- I mean, no proper reason due to the fact that I was under psychiatric care. Then correctional officers shouldn't have had any interaction with me in any shape, form or fashion.
>
> So [I'm] saying that any force that was used was excessive because he should not have even been in my cell at all. . . . Unless the doctor told him to come in there.

(Doc. # 183-1 at 22(87)). Mr. Ball believes that because he was under psychiatric care, Officer Singleton did not have any authority or right to come into his cell, and that Officer Singleton should have gotten the permission of the medical staff before doing so. (Doc. # 183-1 at 23(89, 90)). According to Mr. Ball, such a policy applied to all correction officers in the Jail. (Doc. # 183-1 at 23(89-90)). Mr. Ball propounded the following interrogatory to Officer Davis: "During Nov. 2014 thru Jan. 6, 2015, did you require subordinates to follow the cell extraction Policy Regulation or S.O.P. at said Jail?" (Doc. # 159 at 5; Doc. # 163-1 at 23). Officer Davis answered: "Regardless of the date, personnel are required at hire to follow policy." (Doc. # 163-1 at 23).

### F.  Involuntary Commitment

Dr. Norman Huggins, a physician and psychiatrist, treated Mr. Ball at the Jail. On December 11, 2014, Dr. Huggins noted that Mr. Ball "poses an imminent danger to [him]self and others due to impaired judgment and delusional beliefs." (Doc. # 191 at 29). Dr. Huggins also noted that he "will file petition for involuntary commitment due to depression, paranoia, delusional beliefs, and agitation." (Doc. # 191 at 30). Defendant Deirdre Daniels was a social worker at the Jail during Mr. Ball's incarceration. (Doc. # 183-8 at 12; Doc. # 163-1 at 10).[28] Her responsibilities included "prepar[ing] petitions upon recommendation from the [d]octor for all prisoners at the Birmingham City Jail." (Doc. # 183-8 at 12; *see also*, Doc. # 163-1 at 11). On

---

[28] In his deposition, Mr. Ball described her as the social worker "supervisor" at the Jail. (Doc. # 183-1 at 19(76)).

December 16, 2014, Dr. Huggins wrote the following in Mr. Ball's medical record: "social worker please notify detainee of status of petition." (Doc. # 191 at 31). That same date, Ms. Daniels filed the petition. (Doc. # 191 at 36; *see also*, Doc. # 163-1 at 10; Doc. # 141-1 at 6).[29] On January 7, 2015, the probate judge issued a notice to Mr. Ball stating that Ms. Daniels had filed the involuntary commitment proceedings, and informing Mr. Ball of the January 16, 2015, hearing date. (Doc. # 191 at 36). On January 5, 2015, two days before the probate judge issued the notice to Mr. Ball, Trinity Hospital admitted Mr. Ball "under a probate court petition for assessment of symptoms of psychosis and agitation." (Doc. # 183-1 at 12(46, 47); Doc. # 191 at 34).[30] In her affidavit, Daniels states:

> Upon receipt of documentation and the [d]octor[']s orders dated December 11, 2014, I filed a Petition for Involuntary Commitments [sic] in Jefferson County Probate Court in a timely manner. Once notified by Jefferson County Probate Court that the Judge approved the Petition and a bed was available, Mr. Ball was transported to the hospital.

(Doc. # 183-8 at 13).[31] Because Mr. Ball stayed at Trinity Hospital for seven or eight days (Doc.

---

[29] The notice issued by the Probate Court states that Ms. Daniels filed the petition on December 16, 2014. (Doc. # 191 at 36). While part of the actual petition appears in the record, it bears no indication as to when Ms. Daniels filed it. (Doc. # 191 at 37). Ms. Daniels denies Mr. Ball's assertion that she "delayed" filing the Petition. (Doc. # 141-1 at 7).

[30] Mr. Ball also testified that the doctor issued his order on November 11, or December 11, 2014, but that Daniels did not act to have him committed until January 5, 2015. (Doc. #183-1 at 20(77-79)). The only evidence of such an order from Dr. Huggins is the December 11, 2014, order regarding involuntary commitment. As noted above, Ms. Daniels filed the petition on December 16, 2014.

[31] The petition erroneously states that Dr. Huggins made his determination regarding involuntary commitment on December 12, 2014, instead of December 11, 2014. (Doc. # 191 at 37). In her responses to Mr. Ball's First Interrogatories, Ms. Daniels denies that this error was an "alteration," as Mr. Ball has alleged. (Doc. # 141-1 at 7).

The court also notes inconsistencies in the evidence presented by Ms. Davis. On December 7, 2017, Daniels responded to Mr. Ball's First Interrogatories and agreed that she filed the petition. (Doc. # 141-1 at 6, ¶ 1). On July 12, 2018, Ms. Daniels responded to Mr. Ball's Second Interrogatories. (Doc. # 163-1 at 8). In those responses, Ms. Daniels could not remember whether <u>she</u> filed the petition or not, the date of the filing of the petition, or whether Mr. Ball was hospitalized because of the filing of the petition. (Doc. # 163-1 at 9-11, ¶¶ 1, 3-7, 10). Those responses were inconsistent, on their face, with another answer she gave, in that same document, to a question regarding "whether [she] complied with [the] physician's recommendation to initiate the involuntary commitment

# 183-1 at 12(49)), he was released from Trinity prior to his hearing date. No order committing Mr. Ball appears in the record, and it is unclear whether there was a hearing and/or what became of this petition.

### G. Mr. Ball's Prescribed Dietary Needs

While at the Jail, Mr. Ball could not take his medications without food because they upset his stomach. (Doc. # 191 at 15). On November 24, 2014, Dr. Huggins ordered staff to give Mr. Ball snacks with his medication. (Doc. # 191 at 25). Dr. Huggins followed up with Mr. Ball on December 1, 2014, and noted that Mr. Ball had lost 8 pounds over the previous three weeks, and that Mr. Ball "feels like he's being starved." (Doc. # 191 at 26). It is undisputed that Dr. Huggins ordered the Jail staff to give Mr. Ball "double portions with meals." (Doc. # 191 at 26; *see also*, Doc. # 183-1 at 17(66)). Dr. Huggins also noted that the Jail staff were not giving Mr. Ball snacks with his medications as ordered, and that Mr. Ball could not take his medications without a snack because they upset his stomach. (Doc. # 191 at 26). Dr. Huggins explained that "the intent of granting snacks with meds is to have food on his stomach prior to taking meds." (Doc. # 191 at 26-27). On December 16, 2014, Dr. Huggins saw Mr. Ball again and noted: "Nurse reports [Mr. Ball] refuses to take 4:00 a.m. med[ications] without snack. Snacks are not given in a.m." (Doc. # 191 at 31).[32]

Defendant Emantic Bradford was the Chief Steward or Cook while Mr. Ball was at the Jail. (Doc. # 141-1 at 2; 163-1 at 15; Doc. # 183-8 at 17; Doc. # 191 at 39). It was Mr. Bradford's responsibility to determine whether Mr. Ball had special dietary needs while Mr. Ball was there. (Doc. # 141-1 at 3; Doc. # 163-1 at 15-16; Doc. # 191 at 40).

---

for [Mr.] Ball[?]" (Doc. # 163-1 at 10, ¶ 2). In response to that question, she stated that she "complied with the doctor's orders concerning Mr. Ball's treatment." (Doc. 163-1 at 10, ¶ 2).

[32] While Mr. Ball attributes the nurse's report to Defendant Taylor (Doc. # 191 at 15), nothing in the record indicates who made the report.

Officer Davis agrees that "[s]tewards are required to follow doctor's orders." (Doc. # 163-1 at 23). Mr. Ball says he spoke to Officer Davis "on numerous occasions" while he was incarcerated. (Doc. # 183-1 at 16(64), 17(65)). When asked for the substance of those conversations, Mr. Ball explained:

> Well, I was complaining about my living conditions and the fact that I was losing so much weight due to the fact that the steward was not compliant with the doctor's recommendation.
>
> And she told me that the steward was supposed to comply verbatim with the physician's recommendation for double portion food trays, which is two trays instead of giving me increased calories, which is when the steward increased only one food portion on the tray.

(Doc. # 183-1 at 17(65-66); *see also*, Doc. # 183-1 at 17(68)).

Mr. Ball testified that Mr. Bradford, "was inadequately trained and supervised to know what he should issue me according to the doctor's recommendation." (Doc. # 183-1 at 17(66), 18(69)). Although the nursing staff informed Mr. Bradford of Mr. Ball's dietary needs (Doc. # 163-1 at 16; Doc. # 183-8 at 17)[33], Mr. Ball states in his declaration that "Bradford gave me single portions during Nov[ember] 2014 thr[ough] March 2015." (Doc. # 191 at 15).

In Mr. Bradford's answers to Mr. Ball's Second Interrogatories, Mr. Bradford acknowledges that "double portions" means that "[p]ortions on the food trays are doubled." (Doc. # 163-1 at 16). Mr. Bradford also states that he gave Mr. Ball "double portions." (Doc. # 163-1 at 17). In those same responses, Mr. Bradford also states that he gave Mr. Ball "increased calories." (Doc. # 163-1 at 17). In his answers to Mr. Ball's First Interrogatories, Mr.

---

[33] In his answers to Mr. Ball's First Interrogatories, executed on December 7, 2017, Mr. Bradford states that Nurse Kathy Brimer told him about Mr. Ball's dietary needs. (Doc. # 141-1 at 3; Doc. # 191 at 40). On July 17, 2018, in his answers to Mr. Ball's Second Interrogatories, Mr. Bradford states that he does not recall who exactly told him, but knows "the nursing staff" told him. (Doc. 163-1 at 16). Defendant Taylor was on the nursing staff and states in her affidavit that <u>she</u> "advised Mr. Bradford of Mr. Ball's dietary requirements prescribed by a physician." (Doc. # 183-8 at 15). In his affidavit, Officer Brown states that <u>he</u> "advised Mr. Bradford of Mr. Ball's dietary requirements prescribed by the physician." (Doc. # 183-8 at 10).

Bradford states that someone named "Dr. Mahmoud" told him to issue Mr. Ball "increased calories." (Doc. # 141-1 at 3; Doc. # 191 at 40). In Mr. Bradford's affidavit, he does not state that he gave Mr. Ball "double portions"; rather, he states that he followed Dr. Huggins's orders by giving Mr. Ball "increased calories which is increased or larger portions of vegetables, greens, beans, fruit, juice[,] or milk. Meat entries are usually not increased because of supply, but everything else on the day's menu is increased." (Doc. # 183-8 at 17-18; Doc. # 163-1 at 16, 17). In Mr. Ball's Second Interrogatories, he asked Officer Davis "whether the terms 'Increased Calories' and 'Double Portions Food Trays' means the exact amount of food," and Davis replied that she "[does] not understand the Interrogatory as it is written." (Doc. # 163-1 at 24).[34]

Defendant Freida Taylor was a nurse at the Jail during Mr. Ball's incarceration. (Doc. # 141-1 at 18; Doc. # 183-8 at 14). Her responsibilities included monitoring, coordinating, and supervising the medical care for prisoners. (Doc. # 183-8 at 14). Officer Davis was Ms. Taylor's supervisor. (Doc. # 183-8 at 14). Ms. Taylor's affidavit states in pertinent part:

> If a correctional officer or the prisoner feels that he or she is not being treated appropriately, a grievance form can be filed. A prisoner can even request to see the City Jail Chief. I do not recall Mr. Ball requesting medical treatment or filing any of these forms.

(Doc. # 183-8 at 15).

Defendant Coyrrie Campbell is a correctional officer at the Jail. (Doc. # 183-8 at 19). "Sergeant Shelby" is his supervisor. (Doc. # 183-8 at 19). In his affidavit, Officer Campbell states that he began his employment with the Jail in 2016, and therefore he was not working at the Jail when Mr. Ball was there. (Doc. # 183-8 at 19). Officer Campbell is not familiar with Mr. Ball. (Doc. # 183-8 at 19).

---

[34] Although Mr. Ball testified in his deposition to having had direct conversations with Mr. Bradford, Mr. Fullerton did not ask him about the substance of those conversations. (Doc. # 183-1 at 19(74)).

Mr. Ball testified that Ms. Taylor and Officer Campbell knew about and ignored his dietary needs. (Doc. # 183-1 at 18(70)). Mr. Ball clarified that Ms. Taylor and Officer Campbell "failed to ensure that [he] received the recommended physician's treatment," and explained that they either did not tell Mr. Bradford about Mr. Ball's dietary needs, or they told Mr. Bradford and he failed to comply. (Doc. # 183-1 at 18(71-72)). Mr. Ball testified to having had direct conversations with Ms. Taylor and Officer Campbell, but Mr. Fullerton (counsel for the City Defendants) did not ask him about the substance of those conversations. (Doc. # 183-1 at 19(73)). Ms. Taylor agrees that the responsibility to notify Mr. Bradford about Mr. Ball's dietary needs lies with the "[m]edical department at the Jail." (Doc. # 141-1 at 19). In her affidavit, Ms. Taylor states that she advised Mr. Bradford that Dr. Huggins had ordered that Mr. Ball receive double portions. (Doc. # 183-8 at 15). She also states that Mr. Ball did receive double portions. (Doc. # 183-8 at 15). In his First Interrogatories to Ms. Taylor, Mr. Ball asked her "who altered [the] physician's recommended 'double portions' [order] to 'increased calories.'" (Doc. # 141-1 at 19). Taylor answered that she "[had] no knowledge of any altered documents." (Doc. # 141-1 at 19).

Mr. Ball testified that he experienced internal bleeding and weight loss at the Jail and attributes those conditions to his diet while there. (Doc. # 183-1 at 13(52)). Mr. Ball also testified:

> [O]ne reason why they sent me [to UAB] was because of my weight loss, and the City jail personnel was not complying with the doctor's recommendation. So they sent me over there to try to get my weight back up, you know, so that I can try to get better.

(Doc. # 183-1 at 13(51-52)). On December, 11, 2014, Dr. Huggins noted that Mr. Ball had lost "12.2 pounds in 20 days." (Doc. # 191 at 28).

Mr. Ball agrees that there were times at the Jail when he refused to eat the food given to

him because "[i]t wasn't what I was supposed to have. . . . It wasn't the doctor's recommendation." (Doc. # 183-1 at 14(53)). While in the Jail, Mr. Ball complained about not having salt and/or pepper and "the entire food process." (Doc. # 183-1 at 14(54)). He clarified that "the food process was being inadequately prepared and the doctor's recommendation was not being complied with." (Doc. # 183-1 at 14(54)).

## IV.    Analysis

"The Eighth Amendment, applicable to the states through the Fourteenth Amendment, 'set[s] limits on the treatment and conditions that states may impose on prisoners.'" *Ivory v. Warden, Governor of Alabama*, 600 F. App'x 670, 676 (11th Cir. 2015) (quoting *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1571 (11th Cir.1985)).[35] The Eleventh Circuit has explained that, "[i]n the prison context, three distinct Eighth Amendment claims are available to plaintiff inmates alleging cruel and unusual punishment, each of which requires a different showing to establish a constitutional violation." *Thomas v. Bryant*, 614 F.3d 1288, 1303 (11th Cir. 2010). Those three claims arise when a prisoner is: (1) challenging specific conditions of confinement; (2) challenging the excessive use of force; and (3) challenging prison officials' deliberate indifference to his serious medical needs. *Id.* at 1303–04. Through the various counts of his Second Amended Complaint, Mr. Ball alleges all three types of Eighth Amendment claims. The court will examine each such claim in turn.

### A.  Count One – Conditions of Confinement Claim (Defendant Davis)

#### 1.  The Basis for the Claim

In Count One, Mr. Ball's sets out a conditions of confinement claim against Officer

---

[35] Plaintiff states that he was a "pretrial detainee." (Doc. # 74 at 1, ¶ 2). "Technically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees[.] However, the standards under the Fourteenth Amendment are identical to those under the Eighth." *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (citations omitted).

Davis. (Doc. # 74 at 10). Mr. Ball alleges that "[t]he conditions of the cell where plaintiff was held failed to meet minimum constitutional standards and therefore violated plaintiff's right to due process of law." (Doc. # 74 at 10, ¶ 35). Specifically, Mr. Bell alleges that "[t]he day after he was arrested, [he] was placed in a suicide watch strip cell and not allowed out." (Doc. # 74 at 5). He also alleges that:

- "the sink [provided in the cell did] not have sufficient pressure to get any water beyond a trickle," and "the only water that did trickle out was hot and not fit for drinking" (Doc. # 74 at 5, ¶ 18);

- "[n]o toilet paper was kept in the cell and, if plaintiff needed any, he would have to ask for it" (Doc. # 74 at 5, ¶ 18);

- "[t]he cell had no, or inadequate, heat" (Doc. # 74 at 5, ¶ 18);

- "[t]he cell had no lights," and Jail personnel kept him in "constant darkness" (Doc. # 74 at 5,6, ¶¶ 19, 21);

- "[he] was not permitted to shower" and did not have the "ability to maintain personal hygiene" (Doc. # 74 at 5,6, ¶¶ 19, 21);

- "[he] was kept in complete isolation from other inmates" (Doc. # 74 at 5, ¶ 19);

- he had no "human contact" as Jail staff "kept [him] in complete isolation from other inmates," and only minimally communicated with him when, "through a tray slot in the door to his cell," Jail staff gave him food at mealtimes and medication three times per day (Doc. # 74 at 5, 6, ¶¶ 19, 21); and

- "[he] was given no utensils to eat with" and Jail staff served him food on Styrofoam plates (Doc. # 74 at 5, ¶ 19).

In summary, Mr. Ball alleges that he endured these "ongoing" conditions "for months," and that

"Defendant Davis was aware of these conditions, was ultimately responsible for correcting them, chose not to[,] and was therefore deliberately indifferent to their existence." (Doc. # 74 at 10, ¶ 37).

### 2. Applicable Law

"The Eighth Amendment governs the conditions of a prisoner's confinement." *Brooks v. Warden*, 800 F.3d 1295, 1303 (11th Cir. 2015) (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation and citation omitted). Jail officials may not expose a prisoner to an objectively "unreasonable risk of serious damage to his future health." *Brooks*, 800 F.3d at 1303.

Mr. Ball must prove three elements in order to show that his conditions of confinement were unconstitutional.

> The first element sets an objective hurdle, where "a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment." *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (quotation marks omitted). An objective Eighth Amendment violation "must be extreme" and deprive the prisoner "of the minimal civilized measure of life's necessities." *Id.* (quotation marks omitted) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). The second requisite element is a subjective one: "[T]he prisoner must show that the defendant prison officials acted with a sufficiently culpable state of mind with regard to the condition at issue." *Id.* (quotation marks omitted). Negligence is not enough; the officer "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1289-90 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Finally, and separately, the plaintiff must prove "a causal connection between the defendants' conduct and the Eighth Amendment violation." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015).

*Saunders v. Sheriff of Brevard Cty.*, 735 F. App'x 559, 564–65 (11th Cir. 2018). Furthermore,

> [A] court considering an Eighth Amendment challenge to conditions of confinement must examine the totality of the circumstances. Even if no single condition of confinement would be unconstitutional in itself, exposure to the

cumulative effect of prison conditions may subject inmates to cruel and unusual
punishment.

*Rhodes v. Chapman*, 452 U.S. 337, 362–63 (1981) (Brennan, J. concurring) (internal citations
and quotations omitted); *see also Wilson v. Blankenship*, 163 F.3d 1284, 1292 (11th Cir. 1998)
("[O]ur court evaluates particular pretrial detainee complaints against the totality of confinement
conditions to determine if there is constitutional deficiency."); *Jones v. Diamond*, 636 F.2d 1364,
1368 (5th Cir. January 29, 1981), *overruled on other grounds by Int'l Woodworkers of Am.,
AFL-CIO & its Local No. 5-376 v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986) ("In
determining whether conditions of confinement are unconstitutional under the eighth amendment
or the fourteenth amendment, we do not assay separately each of the institutional practices but
look to the totality of conditions.").[36]

### 3. The Movants Have Failed to Carry Their Initial Burden

The Movants' arguments indicate they seek summary judgment only on the basis that Mr.
Ball cannot make out a prima facie case of unconstitutional conditions of confinement. That is,
they do not argue that Officer Davis lacked the requisite state of mind to be liable, or that there is
no causal link between Officer Davis's conduct and the alleged violations. The Movants also do
not argue the individual conditions Mr. Ball alleges, or any combination thereof, are not
constitutional violations. They argue only that "[Mr.] Ball's allegations are false." (Doc. # 183 at
22).

Because of the nature of the Movants' argument, it is important that the court review the
applicable burdens of proof for a summary judgment motion. In their brief, the Movants note that
"the burden of proof is and always remains on the Plaintiff." (Doc. # 183 at 8). While that may

---

[36] "[T]he decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on
September 30, 1981, handed down by that court prior to close of business on that date," are binding precedent for
courts, such as this court, which fall within the Eleventh Circuit. *Bonner v. City of Prichard, Ala*., 661 F.2d 1206,
1209 (11th Cir. 1981).

be true at trial, a party requesting summary judgment always bears the initial responsibility of informing the court of the basis for their motion and identifying those portions of the pleadings or filings that they believe demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. How the Movants may satisfy their initial evidentiary burden depends on what party or parties bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). On issues where Mr. Ball bears the burden of proof at trial, such as the elements of his prima facie case, the Movants may simply show that there is an absence of evidence to support the Mr. Ball's case on the particular issue at hand and they are entitled to judgment as a matter of law. *Id*. at 1116. Here, the Movants have made no such showing. As noted previously, they ignore Mr. Ball's evidence entirely.[37]

The other method the Movants may use to discharge their burden is to provide affirmative evidence demonstrating that Mr. Ball will be unable to prove his case at trial. *Id.* The Movants state:

> The jail has lighting which is controlled from the inside and outside of the cell. Personal hygiene is given to all detainees they [sic] are each provided with toilet tissue, soap, as well as wash cloths. Correctional Officers are required to perform 15-minute cell check [sic] in administrative segregation and 30-minute cell checks in general population. Each cell has two (2) detainees and administrative

---

[37] The Movants write the following in their initial brief:

> It should be further noted that [Mr.] Ball did not depose the policy maker for the City of Birmingham Police Department or even conduct a Fed. R. C. P 30(b)(6) witness. [Mr.] Ball did not depose any of the individual Defendants. [Mr.] Ball also did not depose any doctors or a medical expert regarding any medical issues that he is alleged to have suffered based upon his alleged treatment at the City Jail.

> [Mr.] Ball has failed to carry his burden, with that, the City and individual Defendants are due summary judgment as to all claims.

(Doc. # 183 at 8). The mere statement that Mr. Ball "has failed to carry his burden" is not a sufficient "showing" under Rule 56. Furthermore, in deciding a motion for summary judgment, and consistent with Rule 56(c)(3) of the Federal Rules of Civil Procedure, the court looks only at whether the "cited [evidentiary] materials" and, if it chooses, "other materials in the record," create a genuine issue of material fact. How the parties secured (or did not secure) those materials is irrelevant. *See id.*

segregation house [sic] one (1) detainee. Detainees are allowed out of their cell with other detainees in general population. In segregation [sic] they are allowed one (1) hour out of their cell for recreation and to take showers. Although they are in segregation [sic] they can communicate verbally with other detainees housed in the area as well as officers who perform their cell checks. In addition, Ball would have been allowed one (1) hour out of his cell per day during which he could shower and exercise.

(Doc. # 183 at 22) (citing "Davis Affidavit"). This exact language appears in Officer Davis's affidavit—the only evidence the Movants cite on this issue. (Doc. # 183-8 at 4).[38] This argument, and the evidence supporting it, does not carry the Movants' burden. Officer Davis merely explains the <u>normal</u> routine and conditions at the Jail (as she believes they existed). She does not address the conditions <u>Mr. Ball testifies he actually experienced at the jail</u>, and therefore does not demonstrate that Mr. Ball cannot succeed at trial. And even if Officer Davis and Mr. Ball's accounts of the jail conditions conflict, the court must credit Mr. Ball's account at the summary judgment stage.

Finally, even assuming Officer Davis had personal knowledge of Mr. Ball's actual

---

[38] In their initial brief, the Movants write that "[Mr.] Ball's allegations against the Individual Defendants and their responses are as follows," followed by separate sections discussing each Defendant, beginning with Officer Davis. (Doc. # 183 at 21). In the section dedicated to the claims against Officer Davis, the Movants cite only Officer Davis's affidavit.

The court notes that in the section of the Movants' brief discussing the claims against Officer Moten, the Movants note the conditions alleged by Mr. Ball and then write:

> Again, this allegation is not true. The jail has lights in every cell. Everyone is provided toilet paper 24 hours a day if requested. Soap and wash cloths are provided, and everyone has an opportunity to shower. There is constant contact with inmates, officers, nurses, social workers, and personal visitors.

(Doc. # 183 at 23-24) (citing Moten Affidavit). Even if the court were to consider this evidence, it suffers from the same problems as Officer's Davis's affidavit—it explains only Officer Moten's version of the normal routine and conditions at the Jail, not the conditions Mr. Ball testifies he actually experienced. Furthermore, like Officer Davis, Officer Moten has no personal knowledge of the conditions Mr. Ball actually experienced since she states that she is not familiar with Mr. Ball (Doc. # 183-8 at 7) and "had no contact with Mr. Ball." (Doc. # 141-1 at 15).

Finally, while the Movants refer to Mr. Ball's conditions of confinement in their discussion of the claims against Officer Brown, that discussion has no probative value as the Movants admit that Officer Brown "has no knowledge of such conditions." (Doc. # 183 at 26) (citing Brown Affidavit).

conditions of confinement, and assuming further that the portion of her affidavit at issue described those specific conditions, the affidavit still does not address Mr. Ball's claims regarding the following: the problems with the sink in his cell (Doc. # 74 at 5, ¶ 18); the broken window in his cell and the lack of adequate heat (Doc. # 74 at 5, ¶ 18); and the service of his meals on Styrofoam plates with no eating utensils (Doc. # 74 at 5, ¶ 19).[39] As to these allegations, the Movants have unquestionably failed to satisfy their burden of showing there are no genuinely disputed material facts in the Rule 56 record. The evidence provided by Mr. Ball unquestionably creates a genuine issue of material fact for a jury to resolve.[40]

### 4. Qualified Immunity

To the extent the Movants argue that Officer Davis is entitled to qualified immunity (their brief is not clear on this point[41]), they invoke qualified immunity only with respect to Mr. Ball's deliberate indifference claim in Count Two. (Doc. # 183 at 13-21; *see id.* at 16). They do not argue that qualified immunity bars Mr. Ball's conditions of confinement claim (*id.* at 21-22), and the court is not required to examine an argument the Movants have not made. *See Resolution Trust Corp.*, 43 F.3d at 599. But even if Officer Davis had invoked qualified immunity with

---

[39] The court does not opine as to whether any of these alleged conditions, alone or in combination with others, constitute an Eighth Amendment violation.

[40] If the Movants had satisfied their initial burden, Mr. Ball would then have to respond by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Fitzpatrick*, 2 F.3d at 1116-17. At that point, Mr. Ball may no longer rest on mere allegations; instead, he must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The Movants do not argue that the burden ever shifted to Mr. Ball, or that he failed to carry it. The Movants have neither addressed, nor objected to the evidence contained in his affidavit (Doc. # 191 at 16-17) or his deposition testimony (Doc. #183-1 at 14(56)) which relates to this issue. Under the circumstances, this evidence would be sufficient to satisfy his burden.

[41] The Movants' brief states in conclusory fashion that, "within the qualified immunity framework as above, the individual Defendants were acting within the scope of their discretionary duty." (Doc. # 183 at 21). But in the portion of their brief offering Officer Davis's response to Mr. Ball's allegations, the Movants do not invoke qualified immunity. (*Id.* at 21-22); *c.f.* (*id.* at 26, 29) (invoking qualified immunity on Defendant Singleton's behalf with respect to Mr. Ball's excessive force claim). But, in their concluding paragraph, the Movants write that they are all "entitled to Summary Judgment based on qualified immunity." (*Id.* at 34).

29

respect to the conditions of confinement claim, she is not entitled to qualified immunity on that claim.

Very recently, the Eleventh Circuit explained:

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (internal quotation marks omitted). "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

To be clearly established, a right must be well-established enough "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) (internal quotation marks omitted and alteration adopted). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate" and thus given the official fair warning that his conduct violated the law. *Id.* (emphasis added); *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc) ("The critical inquiry is whether the law provided [Defendant officers] with 'fair warning' that their conduct violated the Fourth Amendment.").

Fair warning is most commonly provided by materially similar precedent from the Supreme Court, this Court, or the highest state court in which the case arose. *See Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012). However, a judicial precedent with identical facts is not essential for the law to be clearly established. *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010). Authoritative judicial decisions may "establish broad principles of law" that are clearly applicable to the conduct at issue. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1209 (11th Cir. 2007). And occasionally, albeit not very often, it may be obvious from "explicit statutory or constitutional statements" that conduct is unconstitutional. *Id.* at 1208–09. In all of these circumstances, qualified immunity will be denied only if the preexisting law by case law or otherwise "make[s] it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." *Youmans*, 626 F.3d at 563.

A defendant who asserts qualified immunity has the initial burden of showing he was acting within the scope of his discretionary authority when he took the allegedly unconstitutional action. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). Assuming the defendant makes the required showing, the burden shifts to the plaintiff to establish that qualified immunity is not appropriate by showing that (1) the facts alleged make out a violation of a constitutional right

and (2) the constitutional right at issue was clearly established at the time of the alleged misconduct. *See Perez v. Suszczynski,* 809 F.3d 1213, 1218 (11th Cir. 2016).

*Gates v. Khokhar*, 884 F.3d 1290, 1296–97 (11th Cir. 2018). The court must "resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts." *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003).

The Eleventh Circuit has also made clear that jail conditions similar to those Mr. Ball has testified to, even if examined in isolation, are constitutional violations. *See Brooks v. Warden*, 800 F.3d 1295, 1306 (11th Cir. 2015) (noting that Eighth Amendment violations can arise from "conditions lacking basic sanitation," including inadequate provision of hygiene items such as toilet paper); *Chandler v. Crosby*, 379 F.3d 1278, 1296 (11th Cir. 2004) ("[T]he right of a prisoner not to be confined in a cell at so low a temperature as to cause severe discomfort and in conditions lacking basic sanitation was well established in 1986."); *Quintanilla v. Bryson*, 730 F. App'x 738, 747 (11th Cir. 2018) (allegation of a deprivation of the basic elements of hygiene states a constitutional violation) (citing *Brooks v. Warden*, 800 F.3d 1295, 1303 (11th Cir. 2015)); *Mitchell v. Stewart*, 608 F. App'x 730, 735 (11th Cir. 2015) (discussing compelled nudity and recognizing the clearly established right to bodily privacy) (citing *Boxer X v. Harris*, 437 F.3d 1107, 1111 (11th Cir. 2006) and *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993)); *Gates v. Collier*, 501 F.2d 1291, 1305 (5th Cir. 1974) ("It is unassailable that the solitary confinement of naked persons in [a] dark hole, without any hygienic materials, any bedding, adequate food or heat, without opportunity for cleaning either themselves or the cell, and for longer than twenty-four hours continuously, is constitutionally forbidden under the Eighth Amendment."); *Jones v. Connors*, 496 F.2d 82, 83 (5th Cir. 1974) (prisoner may not be deprived

of his items for personal hygiene). Therefore, these binding decisions demonstrate that, in each of these areas, the right not to be subjected to those conditions was clearly established at the time of Mr. Ball's confinement. Officer Davis is not entitled to qualified immunity. She is therefore not entitled to summary judgment as to the claim against her in Count One.

### B. Count Two – Deliberate Indifference to Serious Medical Needs (Defendants Campbell, Taylor, and Bradford)

In Count Two, Mr. Ball alleges:

> Defendants Taylor, Campbell, [and others] were all deliberately indifferent to plaintiff's serious medical needs, since they were advised of and ignored the dietary requirements prescribed by a physician[], either by failing to notify defendant Bradford of those requirements or by ignoring the failure to provide plaintiff with double portions.

(Doc. # 74 at 11, ¶ 39). Mr. Ball also alleges:

> Alternatively or additionally, defendant Bradford was notified of plaintiff's requirements and chose not to comply with the doctor's orders. Plaintiff therefore alleges that Bradford was deliberately indifferent to his medical needs.

(Doc. # 74 at 11, ¶ 40). The court analyzes the claims in Count Two against Defendants Campbell, Taylor, and Bradford below.

### 1. Defendant Campbell Is Entitled to Summary Judgment

In their initial brief in support of summary judgment, the Movants submitted the affidavit of Officer Campbell, in which he stated that he began his employment with the Birmingham Police Department in May 2016, and that he did not work at the Jail during Mr. Ball's incarceration. (Doc. # 183-8 at 19).

Having established with affirmative evidence that the City did not employ Officer Campbell at the time, the burden shifted to Mr. Ball to identify conflicting record evidence from which a jury could find that the City employed Officer Campbell at the relevant time. *Fitzpatrick*, 2 F.3d at 1116–17. To be clear, Mr. Ball may no longer rest on mere allegations;

instead, he must set forth evidence of specific facts. *Lewis,* 518 U.S. at 358. Mr. Ball's affidavit does not mention Officer Campbell at all. Even though Mr. Ball does not cite it in response the to the motion, the court notes that in Mr. Ball's deposition he vaguely stated that he had direct conversations with Officer Campbell during his incarceration. (Doc. # 183-1 at 19(73). However, he could not recall the exact date of those conversations and did not elaborate on their substance. That is simply not enough to create a genuine issue of fact as to whether Officer Campbell violated his rights. *See Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004) ("A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment."); *Marcus v. St. Paul Fire & Marine Ins. Co.*, 651 F.2d 379, 382 (5th Cir. 1981 Unit B) (noting that the evidence supporting the non-movant must be substantial). Furthermore, as the Supreme Court has explained:

> [T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks and citation omitted).

Furthermore, even assuming that Mr. Ball could show he had some problematic interaction with Officer Campbell, that is insufficient to find Officer Campbell liable for deliberate indifference on this record. Mr. Ball has offered no evidence that Officer Campbell had "'(1) subjective knowledge of a risk of serious harm; (2) [which he disregarded]; (3) by conduct that is more than mere negligence.'" *Hunt v. Warden*, 748 F. App'x 894, 899 (11th Cir. 2018); *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017). The lack of any detail regarding Mr. Ball's discussions with Officer Campbell

means that Mr. Ball has failed to show that Officer Campbell was aware of facts from which the inference could be drawn that a substantial risk of serious harm to Mr. Ball existed; nor has there been a showing that Officer Campbell in fact had subjective knowledge of any such risk of harm. *Nam Dang*, 871 F.3d at 1280; *Johnson v. City of Bessemer, Alabama*, 741 F. App'x 694, 700 (11th Cir. 2018). Mr. Ball has therefore failed to identify any record evidence from which a jury could find that Officer Campbell violated the Constitution.

Defendant Campbell is entitled to summary judgment on the claim asserted against him in Count Two. As Count Two is the only Count alleged against Defendant Campbell, Defendant Campbell is due to be dismissed with prejudice.

### 2. Defendant Taylor Is Entitled to Summary Judgment

After careful review, and for the reasons explained below, the court concludes Defendant Taylor is entitled to qualified immunity on Mr. Ball's deliberate indifference claim. She is therefore entitled to summary judgment.

### a. Defendant Taylor Acted Within the Scope of Her Discretionary Authority

"An official acts within his discretionary authority if his actions (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Nam Dang*, 871 F.3d at 1279 (internal quotation marks omitted). Mr. Ball does not dispute that Ms. Taylor acted within the scope of her discretionary authority at all times. Furthermore, it is clear that she was doing so by providing direct medical care to Mr. Ball. *See id.* (concluding health care providers acted within the course and scope of their discretionary authority in providing care to inmate). Mr. Ball makes no argument to the contrary.

The burden now shifts to Mr. Ball to show that qualified immunity is not appropriate for Defendant Taylor because (1) the facts alleged make out a violation of a constitutional right and (2) the constitutional right at issue was clearly established at the time of the alleged misconduct.

### b. There Is No Rule 56 Evidence Indicating that Defendant Taylor Violated Mr. Ball's Constitutional Rights

The Eighth Amendment prohibits deliberate indifference to the serious medical needs of prisoners. For that reason, a showing that a defendant was deliberately indifferent "to a prisoner's serious illness or injury states a cause of action under § 1983." *Barcelona v. Parish*, 750 F. App'x 841, 842 (11th Cir. 2018) (internal quotation marks omitted).

> To demonstrate deliberate indifference in violation of the Eighth Amendment, a plaintiff must show "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009). A serious medical need is one that objectively "posed a substantial risk of serious harm" if left untreated. *Gilmore v. Hodges*, 738 F.3d 266, 274 (11th Cir. 2013).

*Id.* at 844.

A "serious medical need" is "'one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment.'" *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1317 (11th Cir. 2010) (*quoting Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008)). "'In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition.'" *Kuhne v. Fla. Dep't of Corr.*, 745 F.3d 1091, 1096 (11th Cir. 2014) (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009)). In this case, Mr. Ball alleges that Ms. Taylor failed "to notify defendant Bradford of [the double portions] requirements or . . . ignor[ed] the failure to provide plaintiff with double portions." (Doc. # 74 at 11, ¶ 39). The Movants make no argument that the requirement that Mr. Ball receive "double portions" was not a serious medical need.

Deliberate indifference, has three components: "'(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.'" *Hunt v. Warden*, 748 F. App'x 894, 899 (11th Cir. 2018) (quoting *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003) (internal quotation marks omitted)); *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017).

"Subjective knowledge of the risk requires that the defendant be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Johnson*, 741 F. App'x at 700 (quoting *Nam Dang*, 871 F.3d at 1280) (internal quotation marks omitted). "'[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual defendant must be judged separately and on the basis of what that person kn[ew].'" *Nam Dang*, 871 F.3d at 1280 (quoting *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008)) (alterations in original). "Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007).

As the Eleventh Circuit has determined:

> An official disregards a serious risk by more than mere negligence "when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997), *overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009). Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs. S*ee Harris v. Coweta Cty.*, 21 F.3d 388, 393–94 (11th Cir. 1994) (citing *Brown v. Hughes*, 894 F.2d 1533, 1537–39 (11th Cir. 1990)). Further, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) (citations omitted). However, medical treatment violates the Constitution only when it is "so grossly

incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation omitted).

*Nam Dang*, 871 F.3d at 1280.

A defendant may be liable for a constitutional violation only when he or she "personally participates" in the alleged constitutional violation or when there is a "causal connection between actions of [a] supervising official and the alleged constitutional deprivation." *Danley v. Allen*, 540 F.3d 1298, 1314 (11th Cir. 2008). Here, there is no evidence that Ms. Taylor was a supervising official or that her actions caused Mr. Ball to be deprived of double portions. Furthermore, it is undisputed that it was Mr. Bradford's responsibility to determine whether Mr. Ball had special dietary needs while Mr. Ball was in the Jail. (Doc. # 141-1 at 3; Doc. # 163-1 at 15-16; Doc. # 191 at 40). It is also undisputed that Ms. Taylor's responsibility, as part of the medical staff, was to notify Bradford about Mr. Ball's dietary needs. (Doc. # 141-1 at 19). In her affidavit, she stated that she did so. (Doc. # 183-8 at 15).[42] There is no evidence to the contrary. Ms. Taylor also contends that the Jail actually gave Mr. Ball double portions. However, that argument misses the mark. For purposes of Rule 56, Mr. Ball's sworn denial that he received double portions creates a fact question for the jury as to that issue. Having said that, there is no evidence in the Rule 56 record that Ms. Taylor had the responsibility, authority, or ability to ensure that Mr. Ball received double portions. In other words, Mr. Ball has not shown that there is a causal connection between Ms. Taylor's alleged action or inaction and any injury he suffered.

Furthermore, the record contains no evidence that Ms. Taylor subjectively knew of and disregarded a risk of serious harm to Mr. Ball. Ms. Taylor carried out her responsibility to notify

---

[42] As noted *supra* note 33, there is evidence that several people passed this information on to Mr. Bradford. (Doc. # 141-1 at 3; Doc. 163-1 at 16; Doc. # 183-8 at 10, 15; Doc. # 191 at 40).

Mr. Bradford of the doctor's double portions order.[43] Because there is no evidence that Ms. Taylor violated Mr. Ball's constitutional rights, Ms. Taylor is also entitled to qualified immunity. *See Gates*, 884 F.3d at 1296–97 (setting out the plaintiff's burden in the qualified immunity analysis to show that the facts alleged make out a violation of a constitutional right).

Defendant Taylor is entitled to summary judgment on the claim asserted against her in Count Two. As Count Two is the only Count alleged against Defendant Taylor, the court will dismiss Defendant Taylor with prejudice.

### 3. Defendant Bradford Is Entitled to Summary Judgment

It is undisputed that it was Mr. Bradford's responsibility to determine whether Mr. Ball had special dietary needs while Mr. Ball was at the Jail. (Doc. # 141-1 at 3; Doc. # 163-1 at 15-16; Doc. # 191 at 40). It is also undisputed that Dr. Huggins ordered staff to give Mr. Ball "double portions with meals." (Doc. # 191 at 26; *see also*, Doc. # 183-1 at 17(66)). Officer Davis agrees that "[s]tewards are required to follow doctor's orders." (Doc. # 163-1 at 23).

The Movants do not argue that Mr. Bradford gave Mr. Ball double portions. In their initial brief, the Movants argued only that Mr. Bradford provided "increased calories" and that "increased calories [means] increased or larger portions of vegetables, greens, beans, fruit, juice[,] or milk. Meat entries are usually not increased because of supply, but everything else on the day's menu is increased." (Doc. # 183 at 24) (citing Doc. # 183-8 at 17-18) (Bradford Affidavit). Other than contending that Mr. Ball's testimony that he did not receive double portions "is false," the Movants have presented no evidence that giving Mr. Ball "increased

---

[43] Further, even if it could be shown that Ms. Taylor knew that Mr. Ball did not receive double portions and ignored that fact (and assuming there was injury to Mr. Ball), there is no evidence in the summary judgment file that Ms. Taylor's conduct was anything more than mere negligence. Mr. Ball cannot prove that Ms. Taylor was deliberately indifferent to his need for double portions.

calories" complied with the doctor's orders that he receive "double portions with meals."[44] Again, the Movants have the initial burden on a motion for summary judgment to identify facts which show that Mr. Ball cannot establish a prima facie case of a constitutional violation.

But more analysis of the summary judgment file is required. In his answers to Mr. Ball's First Interrogatories, Mr. Bradford states that someone named "Dr. Mahmoud" told him to issue Mr. Ball "increased calories." (Doc. # 141-1 at 3; Doc. # 191 at 40). That testimony is uncontroverted. Accordingly, even if Mr. Bradford ignored Dr. Huggins's order, there is uncontroverted evidence that he did so in response to a separate order by another doctor. Even if he did not have other orders, at worst Mr. Bradford was negligent, which is not enough for a deliberate indifference claim. *Hunt*, 748 F. App'x at 899. Furthermore, the court is not convinced that the failure to give double portions, or the substitution of "increased calories" for "double portions" is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058. And, even if Mr. Bradford had violated Mr. Ball's constitutional rights, Mr. Ball has not cited, and the court is not aware of, any authority clearly establishing Mr. Ball's right to "double portions" under these circumstances. Mr. Bradford is therefore entitled to qualified immunity.

Defendant Bradford is entitled to summary judgment on the claim asserted against him in Count Two. As Count Two is the only Count alleged against Defendant Bradford, the court will dismiss Defendant Bradford with prejudice.

### C. Count Three – Conditions of Confinement Claim (Defendants Moten and Brown)

Count Three alleges that "Defendants Moten, Drake and [] Brown left plaintiff naked

---

[44] In his Second Interrogatories, Mr. Ball asked Officer Davis "whether the terms 'Increased Calories' and 'Double Portions Food Trays' means the exact amount of food." (Doc. 163-1 at 24). Officer Davis evasively replied that she "[does] not understand the Interrogatory as it is written." (Doc. 163-1 at 24).

without reason, maliciously and for the purpose of causing him emotional harm." (Doc. # 74 at 12, ¶ 42). Because this court terminated Defendant Drake on December 4, 2017 (Doc. # 137), Officers Moten and Brown are the only defendants remaining as to the claim in Count Three.

It is undisputed that even though Mr. Ball was on suicide watch, Jail personnel should have given Mr. Ball a gown to wear. (Doc. # 163-1 at 24). Mr. Ball states that Jail personnel gave him a gown typically given to people on suicide watch, but that on December 9, 2014, Brown took it from Mr. Ball and gave it to someone else, leaving Mr. Ball naked. (Doc. # 183-1 at 14(56)-15(57), 19(75-76); Doc. # 191 at 17). The Movants do not assert that this incident did not occur. (*See* Doc. # 183 at 26) (discussing Defendant Brown). They also do not argue that a constitutional violation did not occur, or that they are entitled to qualified immunity as to the claim in this count. Indeed, in their initial brief they do not mention this incident at all, making it unclear whether they actually seek summary judgment as to the claim in this count.[45] The Movants have failed to carry their burden to inform the court of the basis for their summary judgment motion as to this claim. *See Celotex*, 477 U.S. at 323; *Resolution Trust*, 43 F.3d at 599. The court will deny summary judgment as to the claim in Count Three.

### D.  Count Four – Excessive Force Claim (Defendant Singleton)

Mr. Ball alleges in Count Four that Defendant Singleton assaulted him and in doing so "maliciously and wantonly" used excessive force. (Doc. # 74 at 12, ¶ 45). In their initial brief, the Movants set out the law regarding excessive force in the context of the <u>Fourth</u> Amendment. (Doc. # 183 at 27). Even the Second Amended Complaint claims that Officer Singleton's conduct violated the <u>Fourth</u> Amendment. However, it is the <u>Eighth</u> Amendment's protections

---

[45] The Movants mention only that Mr. Ball was naked when Singleton came to get him. (Doc. # 183 at 28). Defendant Brown does not mention this incident in his affidavit. (*See* Doc. # 183-8 at 9-11). In his answers to Mr. Ball's First Interrogatories, Defendant Brown states only that he does not recall whether he confiscated Mr. Ball's gown on December 9, 2014. (Doc. # 141-1 at 10).

against cruel and usual punishment which apply to prisoners who claim excessive force by jailers. Despite Mr. Ball's error, and even though counsel drafted the Second Amended Complaint for Mr. Ball, the court will not elevate form over substance but will instead construe this count as if it alleges a violation of the Eighth Amendment.

As the Eleventh Circuit has stated:

> Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (*quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)); *see also Hudson v. McMillian*, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, at 7–8, 112 S.Ct. 995; *see also Whitley*, 475 U.S. at 321, 106 S.Ct. 1078; *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir.1996). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321, 106 S.Ct. 1078 (*quoting Johnson*, 481 F.2d at 1033).

*Skrtich v. Thornton*, 280 F.3d 1295, 1300–01 (11th Cir. 2002). When cast in the light most favorable to Mr. Ball, the facts demonstrate that after Mr. Ball refused to put on a gown, Singleton pushed Mr. Ball against the cell wall, choked Mr. Ball with a steel key, and punched Mr. Ball in the head twice. (Doc. # 191 at 8-9). A reasonable jury could determine that Officer Singleton's actions were not necessary and/or were not applied in good faith to maintain discipline, but instead that his actions were done maliciously and sadistically to cause Mr. Ball harm. Accordingly, summary judgment is not appropriate as to Mr. Ball's excessive force claim against Officer Singleton.

Although Officer Singleton asserts that he is entitled to qualified immunity, he does not

explain why. (Doc. # 183 at 26; *see also* Doc. # 183 at 29). Accordingly, Officer Singleton has failed to satisfy his initial burden to show that he is entitled to qualified immunity.

Even if Officer Singleton had met his initial burden (and, to be clear, he has not), he still would not be entitled to qualified immunity. As the Eleventh Circuit has explained:

> [T]o have a valid claim on the merits of excessive force in violation of [the Eighth Amendment], the excessive force must have been sadistically and maliciously applied for the very purpose of causing harm. Equally important, it is clearly established that all infliction of excessive force on a prisoner sadistically and maliciously for the very purpose of causing harm and which does cause harm violates the Cruel and Unusual Punishment Clause. *So, where this type of constitutional violation is established there is no room for qualified immunity.* It is not just that this constitutional tort involves a subjective element, it is that the subjective element required to establish it is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution[.]

*Johnson v. Breeden*, 280 F.3d 1308, 1321-22 (11th Cir. 2002) (emphasis added). Having determined that a reasonable jury could find that Officer Singleton used excessive force in violation of the Eighth Amendment, qualified immunity is not available to him. Defendant Singleton is not entitled to summary judgment as to the claim in Count Four.

### E.  Count Six – Conditions of Confinement Claim (Defendant Moten)

Count Six sets out a claim against Officer Moten, alleging that Officer Moten "was deliberately indifferent to plaintiff's needs for constitutionally adequate conditions," when Officer Moten "[took] no action after being apprised of the conditions in plaintiff's cell when [Mr. Ball] returned from Grandview [Hospital]." (Doc. # 74 at 13-14, ¶ 49). As with Count One, the Movants do nothing more than dispute Mr. Ball's version of events. (Doc. # 183 at 23-24). And notably, they do not dispute that Officer Moten was aware of the conditions, that she was in a position to correct them, and/or that the conditions, either alone or in combination, constituted a constitutional violation.

As noted above, the Movants invoke qualified immunity only with respect to Mr. Ball's deliberate indifference claim in Count Two. (Doc. # 183 at 13-21; *see especially id.* at 16). Officer Moten does not argue she is entitled to qualified immunity as to Mr. Ball's condition of confinement claim in Count Six. But even if Officer Moten had invoked the defense as to Count Six, she would not be entitled to qualified immunity for the same reasons as Officer Davis in Count One. Officer Moten is therefore not entitled to summary judgment as to the claim in Count Six.

### F. Count Seven – Deliberate Indifference to Mr. Ball's Serious Medical Needs (Defendant Daniels)

In Count Seven, Mr. Ball alleges that Defendant Daniels:

> knew of plaintiff's deteriorating mental health and was apprised of the doctor's belief that he needed to be committed, yet failed to act on that belief for several weeks. The failure reflected deliberate indifference to plaintiff's mental health needs and caused him further deterioration.

(Doc. # 74 at 14, ¶ 51). Mr. Ball testified that Ms. Daniels did not act to have him committed until January 5, 2015. (Doc. # 183-1 at 20(77-79)). The undisputed facts demonstrate that Mr. Ball's claim is without merit. On December 11, 2014, Dr. Huggins first noted the need to file a commitment petition. (Doc. # 191 at 29-30). Ms. Daniels filed the petition on December 16, 2014. (Doc. # 191 at 36; *see also*, Doc. # 163-1 at 10; Doc. # 141-1 at 6).[46]

While it is true that a prison official may act with deliberate indifference by delaying the treatment of serious medical needs, *see Harris v. Coweta Cty.,* 21 F.3d 388, 393–94 (11th Cir. 1994), there is no Rule 56 evidence that the *de minimus* delay alleged here made any difference. The probate court scheduled the hearing for January 16, 2015. (Doc. # 191 at 36). Furthermore,

---

[46] The Notice issued by the Probate Court states that Ms. Daniels filed the petition on December 16, 2014. (Doc. # 191 at 36). While part of the actual petition appears in the record, it bears no indication as to when Ms. Daniels filed it. (Doc. # 191 at 37). Ms. Daniels denies Mr. Ball's assertion that she "delayed" filing the Petition. (Doc. # 141-1 at 7).

even before the scheduled hearing, Trinity Hospital admitted Mr. Ball "under a probate court petition for assessment of symptoms of psychosis and agitation." (Doc. # 183-1 at 12(46, 47); Doc. # 191 at 34). Because Mr. Ball stayed at Trinity Hospital for seven or eight days (Doc. # 183-1 at 12(49)), he was released from Trinity prior to his hearing date. There is no evidence that Mr. Ball was ever officially "committed."

Defendant Daniels is entitled to summary judgment as to the claim in Count Seven. And, because the claim in Count Seven is the only one asserted against her, the court will dismiss Defendant Daniels with prejudice.

### G. Count Eight – Assault and Battery (Defendant Singleton)

Mr. Ball alleges in Count Eight that Defendant Singleton "committed assault and battery upon plaintiff." (Doc. # 74 at 15, ¶ 53). In response, the Movants allege that Officer Singleton is entitled to state-agent immunity and the immunity provided by Alabama Code § 6–5–338 for law enforcement officers. (Doc. # 183 at 29). It is unnecessary for the court to restate here the entire state of the law regarding state-agent immunity. It is sufficient to note that an official is not entitled to such immunity if he or she acted "willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006). As noted in this court's discussion of Mr. Ball's Eighth Amendment claim, a reasonable jury could find from the Rule 56 evidence that Officer Singleton acted maliciously to cause Mr. Ball harm. *See Hollis v. City of Brighton*, 950 So. 2d 300, 305 (Ala. 2006) ("State-agent immunity, does not provide immunity from liability for the commission of an intentional tort."). Furthermore, the Movants cannot reasonably say that, in response to Mr. Ball refusing to put on a gown, Officer Singleton had the authority to push him against the cell wall, choke him with a steel key, and punch him in the head twice. Officer Singleton is not entitled to state-agent immunity. And he is

not entitled to summary judgment as to the claim in Count Eight.[47]

### H. Punitive Damages

The Movants argue that "the action of [the individual] Defendants do [sic] not give rise to punitive damages." (Doc. # 183 at 33). They then cite Section 6-11-20 of the Code of Alabama for the proposition that the "Plaintiff must prove by clear and convincing evidence that [the] individual Defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice." (Doc. # 183 at 33). The only claim to which this standard applies is the assault and battery claim in Count Eight against Officer Singleton. As noted above, a reasonable jury could find that Officer Singleton's conduct was malicious.

The remaining counts are brought under 42 U.S.C. § 1983. "'[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Lambert v. Fulton Cty., Ga.*, 253 F.3d 588, 597 (11th Cir. 2001). The Movants do not cite this standard, certainly do not show that the evidence is insufficient to meet it, and do not provide affirmative evidence demonstrating that Mr. Ball will be unable to meet it. The Movants are not entitled to summary judgment on the punitive damages claims in this case. It may be necessary to revisit this ruling after evidence is presented to the jury.

### I. Claims Against the City of Birmingham

The Second Amended Complaint contains the following allegation:

Because suing a city employee in an official capacity is tantamount to suing the city itself, the City of Birmingham should be added as a party defendant in

---

[47] In their "Conclusion" to their initial brief, the Movants state: "Lawrence Singleton, Deidre Daniels, Emantic Bradford, Corryie Campbell, Verlyn Moton, Timothy Brown, Freida Taylor and Kathie Davis are entitled to Summary Judgment based on . . . state agent immunity." (Doc. # 183 at 34). Because the Movants made no such argument in the body of their initial brief, the court rejects this conclusory and undeveloped argument.

> substitution for the individual defendants in their official capacities. Plaintiff claims that conditions in the Birmingham City Jail's suicide watch cells during the time of his incarceration failed to meet minimum standards for humane, constitutional treatment of inmates.

(Doc. # 74 at 2).

"The Supreme Court has placed strict limitations on municipal liability under section 1983." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Municipal liability "under § 1983 may not be based on the doctrine of respondeat superior." *Grech v. Clayton County*, 335 F.3d 1326 at 1329 (11th Cir. 2003). "[A] municipality may be held liable for the actions of a police officer only when municipal 'official policy' causes a constitutional violation." *Gold*, 151 F.3d at 1350 (citing *Monell*, 436 U.S. at 694-95).

To establish a § 1983 claim against the City, Mr. Ball "must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton*, 489 U.S. at 388). A policy is defined as a "decision that is officially adopted by the municipality . . . ." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). A custom is defined as a "practice that is so settled and permanent that it takes on the force of law." *Sewell*, 117 F.3d 488, 489. (citing *Monell*, 438 U.S. at 690-94). "To show an unconstitutional policy or custom, [P]laintiff must identify the policy or custom, connect the policy or custom with the government entity itself, and show that the particular injury was incurred because of the execution of that policy." *Wilson v. Tillman*, 613 F. Supp. 2d 1254, 1266 (S.D. Ala. 2009). "In order for a plaintiff to demonstrate a policy or custom, it is 'generally necessary to show a persistent and wide-spread practice." *McDowell*, 392 F.3d at 1290; *see also*, *Estate of Binn v. City of Adamsville*, No. 2:17-CV-01993-RDP, 2019 WL 968904, at *8–9 (N.D. Ala. Feb. 28,

2019) (Proctor, J.).

Only Count One of the Second Amended Complaint mentions a policy or practice of the City. (Doc. # 74 at 10. ¶ 36) ("These conditions were ongoing, remained uncorrected for months and therefore their existence constituted a policy or practice of the City of Birmingham."). Mr. Ball has not put forth any evidence of a policy or custom of the City which led to the conditions described in that count, or caused him injury. The City is entitled to summary judgment against Mr. Ball on all claims.

**V.      Conclusion**

For the reasons explained above, the Movants' Motion for Summary Judgment is due to be granted in part and denied in part. Additionally, all claims in this action against unserved Defendants Nunn, Sheffield, Debra, and Rogers are due to be dismissed without prejudice under Rule 4(m). A separate Order will be entered.

**DONE** and **ORDERED** this July 9, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE